2026 IL App (1st) 25-1928-U

No. 1-25-1928

Order filed April 17, 2026

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* T.T., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 23 JA 00806 |
| | ) | |
| v. | ) | Honorable |
| | ) | Diane M. Pezanoski, |
| L.K., | ) | Judge, Presiding. |
| | ) | |
| Respondent-Appellant.) | ) | |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm where the court's finding of a lack of reasonable progress towards reunification during either of two separate nine-month periods was not against the manifest weight of the evidence.

¶ 2    Respondent mother L.K. appeals from the circuit court's determination that termination of her parental rights was minor child's best interests. On appeal, respondent contends that the trial

evidence was insufficient to prove by clear and convincing evidence that she had neglected the minor on the statutory grounds alleged in the termination petition when she was drug-free and visiting the minor at the time of the unfitness hearing. For the reasons that follow we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Adjudication Proceedings

¶ 5     The majority of the underlying facts are not in dispute. The record reveals that the minor, T.T., was born on November 1, 2023, with drugs in her system. The State filed a petition for adjudication of wardship on November 15, 2023, alleging that respondent had neglected and/or abused the newborn minor. In support of that allegation, the State alleged that respondent had a long history of drug abuse and used illicit drugs while pregnant. At birth, the minor tested positive for cocaine, fentanyl, and opiates. Respondent was previously involved in incidents of alleged abuse and showed signs of physical injury; respondent was homeless at that time; and T.T.'s paternity was not established. The petition alleged that those conditions created an injurious environment to the minor and put her at risk of serious physical injury.

¶ 6     After a hearing on March 27, 2024, the circuit court entered an order which adjudicated the minor an abused or neglected child pursuant to sections 2-3(1)(b), (c) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b), (c); 2-3(2)(ii) (West 2022)), The adjudication was based on the fact that she was a minor under 18 years of age whose environment was injurious to her welfare, she was exposed to drugs as an infant, and there was a substantial risk of physical injury. After the adjudication hearing, the circuit court held a dispositional hearing where it found respondent to be unable to care for the minor. The unknown father was found unable and unwilling,

and the minor was adjudged a ward of the court and placed under guardianship of the Department of Children and Family Services (DCFS).

¶ 7                                          B. Permanency Orders

¶ 8      A permanency order entered on the same day noted that respondent had recently checked herself into an in-patient substance abuse treatment program with Southwood Interventions. The order further noted that respondent was not visiting consistently and had not made substantial progress towards the return home of the minor. The permanency goal at that time was return home within 12 months. The next permanency hearing was held on September 25, 2024, and the goal for the minor was changed to return home pending status.

¶ 9      Following the September 2024 permanency hearing, the State filed a motion to reconsider, arguing that the circuit court erred in denying the request of the State and the Guardian *ad litem* (GAL) to change the goal to substitute care pending a court determination on termination of parental rights. The circuit court denied the motion on October 30, 2024, finding that it could not change the goal to substitute care pending court determination of parental rights sooner than nine months after the adjudication findings without a hearing and a finding allowing the early termination of reasonable efforts. As part of that ruling, the circuit court noted that at a status hearing on May 29, 2024, the caseworker testified that she had scheduled three in-person and one Zoom visit between respondent and the minor in April and May of 2024. On the day of each scheduled visit, respondent did not appear despite previously confirming the visits. Additionally, the caseworker testified that respondent called her from the hospital using a hospital phone and they spoke about reunification services. Respondent expressed that she planned to go to an in-patient program after discharge from the hospital. When the caseworker attempted to follow up,

the service provider stated that it could not provide any information without a signed release of information. Ultimately, no records of respondent's participation in that substance abuse program were submitted.

¶ 10    On January 29, 2025, the circuit court entered a permanency order changing the goal for the minor to substitute care pending court determination of termination of parental rights. The order found that all other goals had been ruled out and that respondent made no progress in reunification services. The same day, respondent's counsel filed a motion to withdraw stating that she had no meaningful communication with respondent. However, the circuit court did not rule on the motion to withdraw, and her counsel represented respondent through the filing of the notice of appeal.

¶ 11                  C. Petition for Termination of Parental Rights

¶ 12    On March 25, 2025, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption (TPR petition), requesting termination of respondent's parental rights under the Adoption Act (750 ILCS 50/1 *et seq*. (West 2022)). The petition alleged that respondent was unfit based on four grounds of abuse and neglect: (1) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) desertion of the child for more than three months preceding the commencement of the termination proceedings (*id*. 50/1(D)(c); (3) failure to make reasonable efforts to correct the conditions that were the basis for the child's removal, or failure to make reasonable progress towards the return of the child (*id*. 50/1(D)(m); and (4) intent to forego parental rights as manifested by the failure to visit the child, failure to communicate with the agency, and/or failure to maintain contact or plan for the child (*id*. 50/1(D)(n)). The petition alleged

two nine-month timeframes for respondent's failure to make reasonable efforts or reasonable progress under section 50/1(D)(m), March 27, 2024, through December 27, 2024, and June 25, 2024, through March 25, 2025.

¶ 13    On August 27, 2025, the circuit court conducted an unfitness hearing, a best interest hearing, and a permanency hearing via Zoom.

¶ 14                                    D. Unfitness Hearing

¶ 15    The circuit court took judicial notice of the TPR petition, the supplemental pleading alleging the two nine-month periods, the adjudication findings of March 27, 2024, disposition findings of March 27, 2024, and the permanency hearing orders from March 27, 2024, September 25, 2025, and January 29, 2025. The circuit court admitted exhibits into evidence. The parties stipulated that if called to testify, caseworker Shondra Jones could lay appropriate foundation for the State's exhibits 1-7; the parties stipulated to the foundation of respondent's exhibit 1; and respondent's exhibit 2 was admitted over the objection of the State and the GAL. Only two witnesses testified at the hearing, Jones and respondent.

¶ 16    Jones, a case worker with Ada S. McKinley, testified that she was assigned to the minor's case from the time it opened shortly after her birth through the date of the unfitness hearing, and that she was the only assigned caseworker on the case. Jones testified that respondent was recommended for in-patient substance abuse treatment, a nurturing parenting program, child parent psychotherapy, a psychiatric evaluation, a referral to domestic violence services, and individual therapy.

¶ 17    Respondent participated in a February 2024 DCFS integrated assessment (IA). Respondent disclosed mental health diagnoses of bipolar disorder and schizophrenia during the IA interview

for which Jones was present. The IA noted that respondent gave birth to five children, including the minor. Respondent's mother obtained permanent legal guardianship of the two oldest children, born in 2003 and 2004, in approximately 2017. Two other children died in infancy, years before the minor's birth. Respondent reported that another child, born in 2007, died of Sudden Infant Death Syndrome at seven months old. Another child, born in 2011, died one day after birth. Respondent reported that she drank two or three shots of tequila approximately every four days throughout her pregnancy with that child.

¶ 18    The assessor noted that respondent abused heroin and cocaine for over two decades since she was 17 years old. The IA noted two DCFS prior indicated reports, sequence B and D, against respondent.[1] The sequence B report involved a 2010 incident when respondent stabbed her then 16-year-old brother during an altercation. The report noted that respondent was drinking alcohol prior to that incident.

¶ 19    The assessor also found that respondent's substance abuse, namely her use of heroin, was a factor in her mother obtaining guardianship  of her two oldest surviving children. The sequence D report occurred in September 2017, and respondent was indicated for allegation #77- inadequate shelter, allegation #76- inadequate food, allegation #74- inadequate supervision, and allegation #60- substantial risk of physical injury/environment injurious to health and welfare by neglect to her oldest children, who were then 13 and 14 years old. Respondent and the older children were homeless, and on multiple occasions she left the children alone outside on the street or at a park to get into a car with a man in the middle of the night. In September 2017, respondent left the children

_____

[1] An indicated report is a report of abuse or neglect supported by credible evidence following a DCFS investigation. See *In re J.S.*, 2020 IL App (1st) 191119, ¶ 20, fn. 2.

on the street two blocks away from their great-aunt's home. The children borrowed a stranger's phone to call their great-aunt to pick them up and she subsequently facilitated their transportation to their maternal grandmother's home in Rockford, Illinois.

¶ 20    Due to her heroin use, respondent failed to take the children to the doctor or dentist for several years and they reported that she yelled at them and punched them in the arms and chest. In October 2017, their grandmother obtained permanent guardianship of them while respondent's whereabouts were unknown. In contrast, respondent stated that she dropped the children off with a relative but by the time she returned to retrieve them, her mother had obtained legal guardianship of them for financial gain.

¶ 21    Respondent told the assessor that she didn't realize she was pregnant with T.T. until she was 7 months along and at that time attempted to stop her substance abuse but was unable to do so. The minor tested positive for fentanyl, cocaine, and opiates and exhibited symptoms of withdrawal at birth. The assessor opined that respondent's continued substance abuse suggested that her judgment was impaired and her empathy towards the minor was limited.

¶ 22    The assessor recommended services deemed essential for respondent to address the minor's safety and the reasons she was in foster care, i.e. T.T.'s exposure to substances in utero. Those services included substance use evaluation, treatment, and  recommendations resulting from such evaluation; individual trauma-based therapy to address the lack of safety provided to the minor by exposing her to substances in utero; parenting education and coaching; and at least weekly supervised family time between respondent and the minor. The assessor also recommended additional supportive services for respondent to complete prior to reunification to address the ongoing risk to the minor, including a psychiatric evaluation; ongoing individual therapy to

address respondent's past trauma and wellbeing; a referral to the DCFS domestic violence specialty services coordinator; future consideration of child parent psychotherapy if respondent made progress in her services towards reunification with the minor; for the agency to obtain and review substance abuse and psychiatric records for respondent; a referral to a housing advocate; and adherence with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 *et seq.* (West 2022)).[2]

¶ 23    The service plan dated February 13, 2024, was created by Jones and included action steps for respondent that included entering and completing a drug treatment program, participating in a nurturing parenting program, participating in individual therapy, attending scheduled court hearings, and signing consents for release of information to allow referrals to services to be made. The target completion date for these services was August 31, 2024.

¶ 24    Jones further testified that during a phone call with respondent in February 2024, respondent stated that she was entering a drug treatment program through Southwood Interventions and reported that she began the program in March 2024. However, Jones never received documentation to confirm that respondent completed the substance abuse treatment there. Jones was unable to maintain consistent contact with respondent after March 2024.

¶ 25    A May 6, 2024, service plan indicated that respondent checked herself out of substance abuse treatment at Southwood Interventions and was not currently in any substance abuse treatment program. While respondent had attended all scheduled court hearings, she did not complete any other services. The evaluation portion of respondent's service plan found her

---

[2] Respondent indicated in her IA interview that she had Cherokee heritage through her maternal grandmother. There are no findings in the record that the ICWA applies to respondent, or the minor and respondent did not raise any such issues in her appeal.

progress to be unsatisfactory and indicated that no other services could be recommended until respondent completed an in-patient drug treatment program. Jones indicated that respondent reached out to her via phone in June 2024 and said she was in the hospital. Respondent reported that she hoped to be released from the hospital the following day and that she might enter another drug treatment program when she was released.

¶ 26    Jones also wrote a court report on September 18, 2024, indicating that respondent needed to complete an in-patient substance abuse program and could not be referred to any of her other recommended services until that treatment was completed. Respondent had not been in contact with the agency to arrange for visits with the minor or service referrals, and the report stated that respondent had not engaged with the agency since April 2024, except for the phone call in June.

¶ 27    The November 8, 2024, service plan noted that the action steps for respondent remained the same as in the prior service plan. Respondent had not made herself available for any service referrals or signed any consents for relief of information. Respondent was rated unsatisfactory for her lack of progress, and the evaluation narrative portion of the service plan again indicated that because respondent had not completed in-patient substance abuse treatment and she had not made herself available to the agency or the caseworker, she could not be referred for any of her other services,

¶ 28    Jones testified that she did not hear from respondent until November 2024 when she called about the minor's first birthday, despite conducting diligent searches for respondent. Jones held a staffing with the agency prior to the January 2025 permanency hearing for the minor. As a result of that staffing, the agency recommended a permanency goal of substitute care pending court determination on termination of parental rights. That recommended goal was based on the lack of

contact between respondent and the minor, respondent's failure to complete services and the best interests of the minor. On January 29, 2025, the circuit court changed the permanency goal as recommended by the agency.

¶ 29    A March 26, 2025, court report noted that respondent reached out to the agency in November 2024, December 2024, and March 2025. Additionally, respondent called Jones in February 2025 and reported that she was in an in-patient substance abuse treatment program at Brandon House that would last 30 to 60 days. Respondent then called on March 10, 2025, and reported that she was in substance abuse treatment with A Safe Haven. The March 26, 2025, court report, like the previous reports, indicated that respondent could not be referred for further services until she completed her in-patient substance abuse treatment program. Respondent completed that program in March or April of 2025 and was then recommended for intensive outpatient substance abuse treatment.

¶ 30    The April 2025 services plan indicated that respondent had completed a detox program with Brandon House and that she had begun participating in a recovery program at A Safe Haven. The plan noted that while respondent was currently engaged in substance abuse treatment at that time, it was not her first attempt at recovery. The plan stated that while her participation in treatment was positive, her pattern of multiple prior attempts at treatment that did not result in sobriety remained a concern. Further, respondent still needed to complete substance abuse treatment before her referral for other services, but respondent had signed consents for release of information on April 23, 2025. Jones received a certificate of completion from Brandon House for respondent's completion of an in-patient drug treatment program. At the time of the unfitness

hearing, respondent's outstanding services included nurturing parenting program, child parent psychotherapy, individual therapy, psychiatric services and domestic violence services.

¶ 31 Jones then testified about respondent's visits with the minor. There were no visits in 2023. In 2024, respondent saw the minor twice, on February 15, 2024, while at the courthouse for DNA testing, and on February 28, 2024, at a scheduled visit. The September 2024 court report stated that respondent was scheduled to visit the minor on Thursdays for three hours but that she had only attended the one visit in February and only stayed for 20 minutes. As of the March 26, 2025, court report, respondent had no in-person contact with the minor since February 28, 2024, and the next visit did not occur until April 23, 2025. Respondent then began visiting consistently with the minor once per month. Respondent attended a total of seven in-person visits with the minor from the time the opened in November 2023 through the unfitness hearing on August 27, 2025.

¶ 32 Jones testified that the agency never recommended unsupervised visitation between respondent and the minor due to respondent's lack of visitation, respondent's lack of communication with the agency, and respondent's history of substance abuse. Following a mediation in April 2025, the agency agreed to explore offering respondent visits longer than two hours and planned to offer her a first three-hour visit to occur the day before the unfitness hearing. The expanded visit did not occur, however, because respondent had a conflicting appointment. Jones testified that during the life of the case, her phone number, and the agency's phone number and address had remained the same.

¶ 33 Respondent testified on her own behalf. She stated that she completed a drug treatment program with A Safe Haven. Respondent further testified that she did not always call Jones from her own phone number and confirmed that the last time she spoke with Jones was the day before

the unfitness hearing. She stated that for the first seven months of the minor's life, she only spoke with Jones once or twice, and maybe only once in 2023. In the first six months of 2024, respondent estimated that she spoke with Jones four times and attempted to contact Jones more often when she entered treatment. She stated that she could not always have her cell phone in the places where she stayed, and that Jones was sometimes busy and unable to answer the phone. In contrast to Jones' testimony, respondent stated that beginning in February 2025, she began reaching out to Jones on a more consistent basis, weekly or bi-weekly.

¶ 34    In February 2025, respondent called Jones and told her that she had been in and out of Haymarket for substance abuse treatment and that she went to the hospital for high blood pressure. Respondent also indicated that she asked Jones for help getting into a facility for treatment because the prior facilities where she sought treatment had not worked for her. Respondent located service providers on her own and was referred to Brandon House in February 2025 where she began a 30-day treatment program on March 7, 2025. Respondent testified that at the time of the unfitness hearing, she was in an intensive outpatient treatment program at A Safe Haven where she attended mandatory meetings, individual therapy, and daily Alcoholics Anonymous and Narcotics Anonymous meetings. The program at A Safe Haven was residential, and she had been in the program continuously since April 4, 2025. Respondent also stated that she was working on employment and education and was doing extremely well.

¶ 35    A June 2025 letter from A Safe Haven indicated that respondent completed a substance use disorder assessment on April 21, 2025, and based on the recommendations of that assessment, began an intensive outpatient treatment with A Safe Haven on April 30, 2025. The letter also stated that respondent was actively participating in the program and had been consistently testing

negative in toxicology tests for all substances except for prescribed methadone. Respondent confirmed that she had only had seven visits with the minor since the case was opened.

¶ 36    Respondent's substance abuse treatment records from Family Guidance Centers, Inc. showed her participation in drug treatment from April through August 2025. According to an August 22, 2025, progress report, respondent had consistently participated in a methadone treatment program, and her toxicology tests reflected "ongoing abstinence" since March 31, 2025. The toxicology results contained in those records showed that respondent was tested five times between April 7 and August 8, 2025, and tested positive for methadone each time.

¶ 37    Respondent further testified that her April 2025 treatment plan indicated that she was diagnosed with manic depression, bipolar, anxiety, and schizophrenia, was not on any medication but wanted to see someone regarding same. An updated treatment plan in August 2025 reflected that respondent was still not taking any medication for her mental health diagnoses but had begun seeing a therapist. All of her treatment plans between April and August 2025 categorized respondent as being at moderate risk for relapse, if not in treatment.

¶ 38    After all testimony and evidence was received, the circuit court found respondent unfit under each of the grounds alleged by the State in its petition.

¶ 39    The court, citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24, noted that the language of ground (b) of the Adoption Act was written in the disjunctive, meaning that the failure to show any one of reasonable care, concern, or responsibility towards the welfare of a child may be a sufficient basis for a finding of unfitness. Further, the circuit court noted that the failure to comply with a service plan, ongoing addiction to drugs, repeated failures to obtain treatment for addiction, and inconsistent visitation have all been held to be sufficient evidence for a finding of unfitness

underground (b). *Id.* The circuit court therefore concluded that there was clear and convincing evidence that respondent was unfit pursuant to ground (b).

¶ 40    With respect to ground (m), the circuit court noted that reasonable progress was an objective standard and could be shown if the court finds that it would be able to return a child to the parent in the near future. The court further acknowledged that 1) ground (m) included a timeframe, and progress towards reunification should only be assessed within the nine-month time periods pled by the State, and 2) a failure to comply with an imposed service plan as well as infrequent or irregular visitation with a child may support a finding of unfitness under both sections (b) and (m). Here, the circuit court found that respondent failed to make both reasonable progress and reasonable efforts in both nine-month periods pled by the State, namely March 27, 2024, to December 27, 2024, and June 25, 2024, to March 25, 2025. The court found that, coupled with the State's exhibits, the caseworker's testimony was credible. The court specifically pointed to Jones' testimony about respondent's failure to maintain contact with the agency, which inhibited Jones from referring respondent for services because she did not know respondent's whereabouts. The court further noted that respondent's contact with Jones was sporadic, with contact occurring once in June 2024 and once in November 2024, and that despite diligent searches, Jones was unable to locate respondent. It was only after the permanency goal changed to substitute care pending court determination on termination of parental rights on January 29, 2025, that respondent called Jones and reported that she was in a substance abuse program.

¶ 41    The circuit court then found that aside from substance abuse treatment, all other recommended services for respondent remained outstanding, including parenting classes, a psychiatric evaluation, domestic violence services, individual therapy, and child parent

psychotherapy. Next, the court analyzed respondent's visitation with the minor over the life of the case, finding that she had only seen the minor seven times since she was born. Of those seven visits, none occurred in 2023, two were in February 2024, and no visits thereafter until April 2025, after the permanency goal changed. The court stated that due to respondent's lack of engagement and contact, the agency was never able to recommend unsupervised visits between respondent and the minor.

¶ 42      The circuit court concluded that respondent deserted the minor for three months preceding the beginning of the termination proceeding, no father ever came forward, and respondent had not visited or contacted the minor for more than a year prior to the filing of the termination of parental rights petition on March 25, 2025. The court found that the State met its burden with respect to ground (m) as to both parents failing to make both reasonable efforts and progress, and that both parents had manifested intent to forgo their parental rights under ground (n) by failing to visit, communicate, maintain contact with, or make future plans for the minor. The court concluded that the 12-month period ran from February 2024 until April 2025.

¶ 43                          E. Best Interests Hearing

¶ 44      The matter then proceeded to a best interest hearing on the same day. The circuit court took judicial notice of the findings and evidence presented at the unfitness hearing.

¶ 45      Jones testified for the State that the minor was placed in a fictive kin placement with someone who had grown up with respondent in the same neighborhood. The placement was safe, appropriate and there were no concerns or unusual incidents for the minor in the placement. The minor was one and one-half years old at the time of the hearing, was not in need of any services

and the foster mother had no concern regarding the minor's development. Respondent had last visited the minor several days prior to the termination hearing.

¶ 46    The fictive kin foster placement was the minor's only placement since the case opened, and the minor resided with her foster mother and the foster mother's son. The minor and her foster mother had a loving bond, and she called her foster mother "Mom." The minor was also bonded to her foster mother's son as a sibling. The foster mother was committed to providing the minor with permanency and wanted to adopt her. Jones testified that it was in the minor's best interests that parental rights be terminated because she had created a bond with her foster mother and her foster parent's family and did not share a bond with respondent.

¶ 47    On cross-examination, Jones described the bond between respondent and the minor as friendly and nice, but the minor was still getting to know respondent. Respondent sent Jones a recording of herself reading a book for the minor at the beginning of August 2025, but there had been no virtual contact outside of scheduled in-person visits. She stated that the agency would be comfortable with respondent continuing to be able to visit the minor and believed that the foster mother would be in support of that as well.

¶ 48    The foster mother, Brandi,[3] also testified for the State. She stated that she had continuously been the minor's foster mother since she was less than one month old as the minor was discharged from the hospital into her care. Brandi's eight-year-old son was the only other person who resided in the home with her and the minor. She stated that the three of them did everything together, including going to church, travelling, and outings to the park. The minor was well-integrated into

---

[3] The foster parent was identified in the record only by her first name.

Brandi's family and community, and she was committed to adopting the minor. Brandi described the minor as a joy and a ray of sunshine in her life.

¶ 49    On cross-examination by respondent's counsel and the GAL, Brandi testified that she intended to tell the minor that she was adopted and to continue to allow contact between respondent and the minor. Brandi stated that she intended to give a phone number to Jones to share with respondent so that they could keep in contact and share pictures of the minor.

¶ 50    On cross-examination by respondent's counsel, Brandi specifically testified that she was comfortable allowing continued contact between respondent and the minor, which she thought could look like meeting up with respondent at places like the zoo where respondent and the minor could have fun and spend time together. Brandi stated that she planned to tell the minor that she was adopted when she was old enough to understand but there was no specific timeframe.

¶ 51    The circuit court found that it was in the minor's best interests that respondent's parental rights be terminated. The court noted that the minor had only been in one foster home and was doing well there and the foster parent was able to able to take care of all of the minor's needs. The court further noted that the minor was bonded to the foster parent and called her "Mom," and was also bonded to the foster parent's son. The foster parent had also signed permanency commitments to adopt the minor. The circuit court then ordered that the DCFS Guardianship Administrator be appointed as the minor's guardian with the right to consent to adoption.

¶ 52    The court admonished respondent of her appeal rights, and respondent's timely notice of appeal was filed on September 22, 2025.

¶ 53                                II. ANALYSIS

¶ 54    On appeal, respondent contends that the trial evidence was insufficient to prove by clear and convincing evidence that she had neglected the minor on the statutory grounds alleged in the termination petition when she was drug-free and visiting the minor at the time of the unfitness hearing. She argues that this is not a case of physical abuse, sexual abuse, a dangerous home environment or any other direct mistreatment of child; rather, respondent believes the central issue to be her historical use of drugs that, if not changed, would ruin her relationship with the minor. Respondent maintains that "[r]ather than praising her achievement of sobriety, however, the circuit court terminated her parental rights to her youngest daughter." She argues that the circuit court erred by "dismissing out of hand the context of [her gaps in visitation and failure to complete services] and dismissing [her] explanations for them, and by disregarding entirely [her] valiant efforts that made up for all such omissions." Respondent concludes that, upon review of the totality of circumstances disregarded by the circuit court, this court cannot rationally conclude that the trial evidence supported the finding that she was an unfit mother by clear and convincing evidence, and further that all parental unfitness findings were against the manifest weight of the evidence and must be reversed.

¶ 55                                    A. Timeliness

¶ 56    Before discussing the arguments respondent raises in her appeal, we address the timeliness of our decision. This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to Rule 311(a)(5), we are required to issue our decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Petitioner's notice of appeal was filed on September 23, 2025, making the deadline to issue our decision February 20, 2026. However, respondent filed a motion for extension of time to file

her opening brief and subsequently filed her appellant brief on November 19, 2025. Both the GAL and the State each filed three motions for extension of time to file their appellee briefs. Accordingly, we revised the briefing schedule pursuant to those requests.[4] With the change in briefing schedule, our new disposition date was April 10, 2026. The public guardian's brief was ultimately filed on March 6, 2026, and the State's brief was ultimately filed on March 11, 2026. However, respondent filed a motion for extension to file her reply brief, which was granted until April 3, 2026, thereby further delaying the disposition date of the appeal. Respondent filed her reply brief on April 8, 2026. We therefore find good cause for issuing our decision after the 150-day deadline. We now turn our attention to the merits of petitioner's issues on appeal.

¶ 57                                    B. Standard of Review

¶ 58    Since termination of parental rights constitutes a permanent and complete severance of the parent-child relationship, the State bears the burden in the circuit court of establishing the parent's unfitness by clear and convincing evidence. *In re J.W.*, 2024 IL App (1st) 231918, ¶ 20. However, any one ground, if properly proven, is sufficient to support a finding of parental unfitness. *Id.*

¶ 59    On review, this court considers whether the circuit court's clear and convincing finding was against the manifest weight of the evidence. *Id.* ¶ 21. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. A determination of parental unfitness involves factual findings and credibility determinations that the circuit court is in the best position to make because the circuit court's opportunity to view and evaluate the parties is superior. *Id.*

---

[4]No objections were filed to any of the requests for extension.

¶ 60    Decisions rendered in other cases are of limited assistance in termination cases as each case concerning parental unfitness is *sui generis*, unique unto itself. *J.W.*, 2024 IL App (1st) 231918, ¶ 22. Hence, factual comparison to other cases are of little value. *Id.*

¶ 61    As noted above, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 46. Based on our review of the record, we conclude that the circuit court's findings that respondent failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence (ground (m)). Accordingly, we discuss only those findings.

¶ 62                            C. Statutory Framework and Applicable Law

¶ 63    The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 50. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022). Our supreme court has held that the benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that prevent the court from returning custody of the child to the parent. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). See also *In re K. P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 64    Likewise, this court has defined "reasonable progress" as follows:

"'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 65                                                D. Reasonable Progress

¶ 66     Here, the State's petition for termination of parental rights alleged two nine-month periods to support its allegation of unfitness, namely March 27, 2024, to December 27, 2024, and June 25, 2024, to March 25, 2025. Although the minor was not adjudged neglected until the hearing on March 27, 2024, the record reveals that she entered protective custody in November 2023 just after she was born with drugs in her system, at which time temporary custody was given to DCFS and the minor was placed in her foster mother's care. While respondent is correct that her principal obstacle to reunification was her substance abuse and her need for in-patient treatment, it was not the only obstacle.

¶ 67     Jones, respondent's caseworker throughout the pendency of this case beginning when the minor was first taken into protective custody in November 2023, testified that respondent was recommended for in-patient substance abuse treatment, a nurturing parenting program, child parent psychotherapy, a psychiatric evaluation, a referral to domestic violence services, and individual therapy. However, respondent needed to first achieve sobriety by successfully completing the in-

patient substance abuse treatment before she could be referred for the other services.. The record contains no documentation to suggest that respondent successfully completed an in-patient substance abuse treatment program between March 27 and December 27, 2024, or between June 25, 2024, and March 25, 2025.

¶ 68    Respondent self-reported to Jones that she was participating in a 30- to 60-day in-patient treatment program at Brandon House in February or March 2025 (respondent's own testimony indicated that she actually began the program on March 7, 2025), and respondent also contacted the agency on March 10, 2025, to report that she was in a residential substance abuse treatment with A Safe Haven. However, documentation from A Safe Haven indicated that respondent completed a substance use disorder assessment on April 21, 2025, and began an intensive outpatient treatment program on April 30, 2025. The record also contains documentation of respondent's participation in additional drug treatment from Family Guidance Centers, Inc. between April and August of 2025. Those records show that respondent participated in a methadone treatment program and her toxicology tests reflected ongoing abstinence since March 31, 2025, which is after both of the applicable nine-month periods.

¶ 69    Moreover, respondent's other services remained outstanding as of the date of the unfitness hearing, namely nurturing parenting program, child parent psychotherapy, individual therapy, psychiatric services and domestic violence services. As respondent had not completed any of the service plans that were set in place between March 2024 and March 2025, she thus failed to make reasonable progress during either of the applicable nine-month periods.

¶ 70    Additionally, and even more telling, is that respondent only had in-person contact with the minor a total of seven times between the time she was placed in temporary custody in November

2023 and the unfitness hearing on August 27, 2025, despite regular visitation being provided for in the various service plans. Jones testified that respondent did not visit the minor at all in 2023, twice in 2024 (once for 20 minutes and again at a court hearing), and did not begin consistent visitation until April 2025, which was well after either applicable nine-month period and a few months after the permanency goal was changed to termination of parental rights. Respondent provided no reason for why she failed to visit her daughter during that time. It cannot reasonably be said that respondent's lack of visitation with the minor supported a finding of reasonable progress towards reunification- rather, it demonstrated the opposite.

¶ 71    We commend respondent's achievement and progress toward achieving sobriety after a difficult and long-term battle with substance addiction.  However, we cannot ignore the fact that she failed to make any progress, let alone reasonable progress toward reunification during the first nine-month period ending on December 27, 2024, or the second nine-month period ending on March 25, 2025.  This is especially so, when she did not even begin her residential treatment program at Brandon House until March 7, 2025, and did not start visiting the minor weekly until April 23, 2025.

¶ 72    We reject respondent's arguments to the contrary, which flagrantly disregard the statutory guidelines by which we are bound. The legislative history of this particular section indicates that, at first, the statute specified a 24-month period, then a 12-month period, and finally a 9-month period. *In re D.F.*, 208 Ill. 2d 223, 233 (2003). It is clear that the legislature did not intend to create an open-ended and essentially *unlimited* period of time. *Id.* at 232. Respondent's argument that we focus on her continued sobriety since March 31, 2025, would transform the statutory time limit into an open-ended and essentially unlimited period of time.    Additionally, as of the date of the

unfitness hearing August 27, 2025, Jones reported that respondent still had not completed nurturing parent program, child parent psychotherapy, individual therapy, psychiatric services, and domestic violence services.

¶ 73     We therefore conclude that the circuit court's findings that the State established by clear and convincing evidence that respondent failed to make reasonable progress towards reunification (ground (m)) was not against the manifest weight of the evidence. Since only one ground suffices, we do not consider the other grounds.

¶ 74                                    CONCLUSION

¶ 75     In conclusion, we affirm the judgment of the circuit court as the record amply supports the court's finding of a lack of reasonable progress towards reunification during the nine-month period ending December 27, 2024, or the second nine-month period ending March 25, 2025, and such findings were not against the manifest weight of the evidence. Nevertheless, we respect respondent's recent triumphs and applaud the foster mother's willingness to maintain contact between respondent and the minor.

¶ 76     Affirmed.